IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JULIE LAGEMANN,                    )
                                   )
            Plaintiff,             )          8:10CV387
                                   )
      v.                           )
                                   )     MEMORANDUM AND ORDER
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
            Defendant.             )

Plaintiff Julie Lagemann ("Lagemann"), seeks review of a decision by the defendant, Michael J. Astrue, the Commissioner of the Social Security Administration ("Commissioner"), denying her applications for disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq., and for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. After carefully reviewing the record, the court finds the Commissioner's decision should be affirmed.

## I. PROCEDURAL BACKGROUND

Lagemann applied for social security disability benefits on November 28, 2005, claiming thoracic outlet syndrome, brachial plexus neuropathy, right carpal tunnel surgery, ulnar and radial nerve damage, myofascial pain syndrome, neck problems, right forearm tendonitis, cervical herniated disc, depression, and migraines have rendered her disabled and unable to work since September 21, 2004. Social Security Transcript ("TR") at 52-56. Her application for disability benefits was denied initially on February 1, 2006, (TR 38-42), and upon reconsideration on May 11, 2006. (TR 44-48).

Lagemann filed a hearing request, and the hearing was held before an Administrative Law Judge ("ALJ") in Omaha, Nebraska on July 22, 2008. (TR 598). Julie Lagemann was

represented by counsel at the hearing.  Testimony was received from Julie Lagemann, Aaron Lagemann (the claimant's husband), and Steven Kuhn, a vocational expert ("VE") who appeared at the ALJ's request.  (TR 600-639).  The ALJ's adverse decision was issued on September 2, 2008, (TR 14-28), and her request for review by the Appeals Council was denied on August 27, 2010.  (TR 6-8).  Lagemann's pending complaint for judicial review and reversal of the Commissioner's decision was timely filed on October 12, 2010.  Filing No. 1 (Complaint).

## II.   THE ALJ'S DECISION.

The ALJ evaluated Lagemann's claims through all five steps of the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920.  (TR 18-33).  As reflected in his decision, the ALJ made the following findings:

1)   The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2)   The claimant has not engaged in substantial gainful employment since September 21, 2004, the alleged onset date.

3)   The claimant has the following severe combination of impairments: moderate sized rectocele, thoracic outlet syndrome, chronic pain syndrome, cervical right radiculopathy, small cervical protrusions at C4, right radiculopathy secondary to C4-C5,  right knee pain with minimal degenerative joint disease and fusion, right carpal tunnel release with radiculopathy on the right, headaches, recurrent major depression, an anxiety disorder, not otherwise specified, with obsessive-compulsive features, and obsessive compulsive disorder.

4)   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5)    The claimant has retained a residual functional capacity ("RFC") to perform sedentary work.

The claimant can:

- lift up to five pounds with her right dominant extremity;

- carry 10 pounds using both hands;

- use her arms to perform work 24 inches from her body provided the arm is rested on a table with the elbow and forearm placed at a starting point for 24 inches;.

- can occasionally crawl, kneel, and climb stairs;

- sleep without difficulty;

- perform 1-2-3 work-related decisions and work that must be learned in 30 days or less; and

- perform complex work, follow complex instructions, or make complex decisions provided she can refer to a book, manual, or written training materials.

However, the claimant cannot

- power lift with the right dominant hand;

- grip and carry five pounds with her right fist, and therefore would have to carry items in the crook of her arm or by bracing the arm up to her torso;

- extend her right dominant hand above the shoulder;

- work with the right upper extremity arm fully extended;

- push or pull levers bilaterally with the upper or lower extremities;

- move her arms one direction and then the other direction;

-3-

- work with her head flexed at a 90-degree angle to her forearm for more than five minutes;

- climb ropes or ladders;

- use air or vibrating tools or motor vehicles; and

- work around unprotected heights, outside, or in a factory with sustained fumes, dust, or smoke.

In addition, when driving in a car, her arm must remain in a fixed position and not move from that position for up to five minutes.

6)   The claimant is unable to perform any past relevant work.

7)   The claimant was thirty-seven years old on her alleged onset date, which is defined as a younger individual under the social security regulations.

8)   The claimant has at least a high school education and is able to communicate in English.

9)   Transferability of job skills is not material to the determination of disability because, using the Medical-Vocational Rules as a framework, the claimant is "not disabled," whether or not the claimant has transferable job skills.

10)  Considering the claimant's age, education, work experience, and residual functional capacity, the claimant is able to perform jobs which exist in significant numbers in the national and regional economy.

(TR 24-27).


### III.   ISSUES RAISED FOR JUDICIAL REVIEW.


Lagemann's complaint requests judicial review of the ALJ's decision.  She raises the following arguments in support of her claim for reversal:

-4-

1)      The ALJ's decision regarding Ms. Lagemann's RFC is not supported by substantial medical evidence and is based on improper inferences from the medical record contrary to opinions of her treating physicians;

2)      The ALJ failed to properly analyze Ms. Lagemann's credibility;

3)      The ALJ's hypothetical questions failed to include all impairments supported by the record; and

4)      The VE's testimony regarding jobs the plaintiff remains able to perform was inconsistent with the Dictionary of Occupational Titles ("DOT").

Filing No. 17 (Claimant's brief).

In response, the Commissioner argues:

1)      The ALJ's assessment of Lagemann's RFC was based on his conclusion that the Lagemann's subjective complaints of depression, sleepiness, pain and disability were not entirely credible;

2)      The ALJ properly and thoroughly outlined the reasons for discounting Lagemann's credibility and the opinions of her treating providers, and these reasons are fully supported by the record;

3)      After carefully considering plaintiff's testimony, the opinions of her physicians, and the evidence and testimony of record, the ALJ determined plaintiff's RFC, incorporating the opinions of plaintiff's treating physicians to the extent they were consistent with the record; and

4)      The VE's opinions regarding jobs available in the national economy is not inconsistent with the DOT.

Filing No. 21 (Commissioner's brief).

IV.  THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

At the time of her hearing, Lagemann was forty-one years old.  She completed her college education in 1990.  Thereafter and until the onset of her alleged disability, she worked as a radiology technician, primarily as an ultrasonographer.  She is able to read, write, and speak English.  She had not worked since November 19, 2004.  (TR 92-102).

The plaintiff has both physical and mental impairments, with her mental and emotional issues pre-dating the onset of her physical symptoms.  At least as early as January 2003, she was receiving counseling and psychiatric care for symptoms of depression, irritability, and excessive somnolence.  She was still receiving such care at the time of her administrative hearing.  Her treating psychiatrist was Sharon J. Hammer, M.D.   Despite several changes in types and dosages of anti-depressive and mood-altering medications, the plaintiff remains chronically depressed.  (TR 534-560).

During the course of her psychiatric treatment, the plaintiff's depression symptoms were "up and down," (TR 570), vacillating from "definitely feels improved on the medication," (TR 537), "mood and anxiety are under good control," (TR 534), and feeling "quite happy," (TR 557), to functioning minimally at home, having to push herself to get things done, avoiding contact with others, and experiencing poor cognitive function and great difficulty making decisions.  (TR 568).  The plaintiff attended psychotherapy sessions with Lucie Long, CMSW, LADC, LMPH, every two or three weeks.

Throughout her history of psychiatric treatment, the plaintiff complained of persistent "daytime sleepiness and lack of motivation" which in combination, made her feel "just barely functional."  (TR 566).  A sleep study performed on the plaintiff in November 2003 revealed upper respiratory resistance.  The plaintiff was prescribed a Continuous Positive

Airway Pressure machine ("CPAP") to use while sleeping at night.  (TR 517, 532-33).  Initially, the plaintiff reported that using a CPAP did not improve her daytime energy level.  Adderall was prescribed.  (TR 531).  A month later, the plaintiff reported feeling "much better."   She explained that neither the CPAP nor the Adderall alone were effective in treating her sleepiness, but when used in combination over the past two days, she felt "much better;" her energy level was much improved, and she was "more alert and awake and not so hypersomnolent."  (TR 530).

At some point, the plaintiff stopped using the CPAP, reportedly due to neck pain.  In January 2008, she told her psychiatrist she was not using the CPAP but was interested in trying it again.  (TR 566).  The plaintiff went back to see the doctor who prescribed the CPAP, and the doctor confirmed the plaintiff should continue using it. (TR 564).  After she re-initiated using the CPAP, the plaintiff's mood improved.  (TR 564).

During the course of plaintiff's mental health treatment, medications and the dosages prescribed were changed several times.  The plaintiff saw Dr. Hammer every four weeks when medications were being changed, but at times, the appointments were three or four months apart.  Each appointment lasted between 20 and 30 minutes. The plaintiff never reported suicidal ideations, and she was never hospitalized for depression or mental health issues.  (TR 603).   At the time of the hearing, the plaintiff reported being unable to concentrate and make decisions, having difficulty with memory recall, and having migraine headaches three to four times a month.  Although the plaintiff acknowledged using the CPAP helped to alleviate her mental health symptoms, she testified that she had difficulty waking up, needed "at least one nap a day," and does best if she has ten hours of sleep at night.  (TR 610).

Plaintiff's chronic daytime sleepiness, her chronic pain from physical injuries, and her associated loss of employment exacerbated her depression and irritability.  As explained by Dr. Hammer:

> Julie's depression has been substantially exacerbated by her chronic pain condition.  Julie's symptoms were stable until she began to experience chronic pain as noted in the medical record.  Since the onset of her chronic painful medical condition, her mood has deteriorated significantly and has not returned to previous point where she was largely free of depressive symptoms.

> Her current depressive symptoms would affect her ability to function in a workplace setting. These symptoms include extreme daily fatigue which has not responded to numerous medication interventions for fatigue.  She also has difficulty with crying spells, hopelessness and decreased motivation, irritability and anger, and social withdrawal.  Her anxiety level has also worsened with the depression and pain and she has difficulty coping with additional stressors and has an excessive amount of daily generalized anxiety and worries.

(TR 512).

Plaintiff's complaints of chronic pain arise from the following physical problems: thoracic outlet syndrome, subacromial bursitis, myofascial pain, carpal tunnel syndrome, neuropathy, nerve damage, right knee pain with a popliteal cyst, right arm tendonitis, migraine headaches, and cervical disc pain.  (TR 44).

In February of 2004, the plaintiff began receiving occupational therapy for right hand and wrist extensor tendonitis.  The treatment focused on soft tissue massage to improve range of motion, moist heat to improve circulation and decrease pain, and iontophoresis. (TR 318).  By April 2, 2004, her pain during activity was 1 to 2 out of 10, with discomfort

-8-

occurring during gripping and squeezing activities.  She reported zero pain at rest.  (TR 300).
She was discharged from occupational therapy on April 23, 2004.  (TR 318)

In May of 2004, the plaintiff complained of right neck and shoulder pain, right arm
weakness, and right hand numbness.  (TR 79, 81).  EMG testing performed on June 2, 2004
disclosed mild carpal tunnel syndrome in the right wrist.  (TR 432).  A cervical MRI
performed on June 11, 2004 revealed a small herniated disc at C4-5 with slight
encroachment in the right nerve root, and a mild posterior disc bulge, which approached but
did not touch the thecal sac, at C5-6.  There was no nerve root compromise or foraminal
narrowing. (TR 334, 394).  Based on the MRI of the plaintiff's right shoulder performed on
June 30, 2004, the plaintiff had mild acromioclavicular joint degenerative changes with
minimal impingement during active motion, and associated subacromial bursitis.  (TR 393).

Dr. Douglas E. Rennels' examination of plaintiff on June 25, 2004 revealed:

NECK  Full range of motion, for flexion/extension, left and right lateral
rotation, left and right flexion.  The cervical spine is non tender to palpation.
There are no distinct trigger points identifiable.  There is a slight sensation on
palpation of the right paracervical musculature.

UPPER EXTREMITIES  Deep tendon reflexes are symmetric and brisk and
triceps, biceps and brachioradialis.  Motor and sensory examination is intact
in both upper extremities.  The right radial pulse is strong when the patient has
her arm in a neutral position.  With extension over her head, radial pulse does
disappear.  There is no distinct fullness noted in the supraclavicular areas on
either left or right side.

(TR 375-76).  His diagnostic impression was "[p]ossible cervical radiculopathy versus
possible thoracic outlet syndrome, right-sided."  (TR 375).  Cervical epidural injections
were administered, and the plaintiff stopped taking pain medications.  She was showing

significant improvement with a pain level of 3 out of 10. (TR 372). Her right arm pain and numbness continued.

The plaintiff received further epidural injections, was fitted with splints, and attended occupational therapy. Upon initial evaluation, Jude Cook, M.D., the medical director for the Methodist Rehabilitation Center, noted plaintiff's reported pain was a 2 to 3 out of 10, and she had good active range of motion in her right upper extremity. (TR 275). She was released to return to "medium work" (occasional 50 pound lifting), on July 15, 2004. (TR 291). Upon examination on July 27, 2004, plaintiff's right hand grip strength was 55 pounds compared to 60 pounds with the left hand. (TR 269). When discharged from occupational therapy in September of 2004, the plaintiff reported her pain as 0 to 4 out of 10. She was encouraged to return to her referring doctor for possible referral to a specialist. (TR 283).

On September 21, 2004, B. Timothy Baxter, M.D. performed right first rib resection surgery to relieve pain and discomfort caused by presumed thoracic outlet syndrome. (TR 354, 357-58). By September 30, 2004, the plaintiff was reporting her pain as "significantly better." (TR 417). However, on October 21, 2004, she complained of recurrent right neck pain for the past week. (TR 416).

John S. Treves, M.D. performed right carpal tunnel release surgery on October 4, 2004, (TR 350), and shortly thereafter, the plaintiff reported "complete cessation of all numbness and tingling into the right hand." (TR 428). However, when the plaintiff returned five weeks later, Dr. Treves reported:

> Despite carpal tunnel release and thoracic outlet surgery, [the plaintiff] continues to complain of pain in her right shoulder, as well as pulling and a painful sensation in her right forearm, which she thinks is related to her prior

-10-

tendonitis and, additionally, numbness of her right hand. She complains that she can't feel things with her right hand and the fourth and fifth fingers feel weak. She additionally has some numbness and decreased sensation in all of the fingers of the right hand. She's not complaining of wrist pain nor is she complaining of the carpal tunnel incision. Dr. Cook apparently has released her from his care. She is seeing Dr. Crabb for an opinion about her tendonitis. He recommended a return to work. She previously was in a brace for her tendonitis.

(TR 426).

From the perspective of her carpal tunnel problems, Dr. Treves released the plaintiff to return to work. The plaintiff was reluctant to return to her job. Dr. Treves noted:

It sounds like everybody has released her to work, including us, but she is hesitant to return. I told her that, from the standpoint of the carpal tunnel surgery, she could return to work, and I thought it would be best if she began using the arm and doing some work activities. . . . She wanted a pain medication. I did not prescribe any.

I'm really confused as to what the issue is with Mrs. Lagemann and her return to work. I get the impression she's not real anxious to get back into her previous line of employment but, at least from the standpoint of her carpal tunnel surgery, I have no reason to withhold her from employment any longer. If she feels that she cannot be an ultrasound tech any longer, then I think she's going to need to meet again with Dr. Cook to determine what her disabilities are, where their source is, and what her final employment will be.

(TR 426-427).

A consulting examination performed on November 22, 2004 revealed:

NECK. Full range of motion. There is minimal tenderness to palpation overlying the lower cervical spine. There are no distinct trigger points identifiable. EXTREMITIES. Upper extremities, deep tendon reflexes are symmetric at the triceps, biceps, and brachioradialis. Motor examination is intact with the exception of questionable weakness in the right biceps.

-11-

> Sensory examination is intact though the patient does note a subjective difference in temperature sensation in the second, third and fourth fingers of the right hand, when compared with the remainder of the examination.

(TR 348).   Essentially the same results were seen a month later, but plaintiff's subjective complaints of pain continued.  (TR 345).

By January 2005, the plaintiff was reportedly doing much better.  No further intervention was recommended and she was advised to continue using myofascial release techniques along with Cymbalta, Skelaxin, Ambien, and Wellbutrin and a TENS unit.  The plaintiff was to return in two months.  (TR 446).

The plaintiff began receiving treatment at a pain clinic from Angie Rakes, M.D. in January 2005. (TR 490, 492).  The plaintiff received trigger point injections and prescription medications, but her complaints of pain continued.  Lagemann saw Dr. Rakes regularly throughout 2005, and began complaining of significant migraine headaches in mid-2005, (TR 443), and knee pain in October 2005.  (TR 455).

On October 10, 2005, Lagemann saw her primary care physician, Rodney R. Czaplewski, M.D., with complaints of mild pain in the right posterior knee.  (TR 455).  On examination:

> Range of motion of the knee is nearly full but extreme flexion and extreme extension are painful.  She has mild fairly localized tenderness just medial to the lateral hamstring in the right popliteal area.  I do not palpate any masses or swelling.  She does not really have pretibial edema either and the calf does not seem to be tender.  There is no drawer sign and no apparent laxity of the ligaments appreciated.

(TR 455).  Dr. Czaplewski diagnosed a likely ruptured popliteal cyst.  (TR 455).  An MRI of the knee revealed "no significant findings," (TR 478); specifically, minimal degenerative changes in the medial compartment with a degenerated meniscus, minimal joint space effusion, and no internal derangement.  (TR 451, 478).

Plaintiff's knee pain cleared up within a few days, but began again a week later in a different part of her knee.  (TR 451).  The range of motion in plaintiff's knee had improved, and there was no deformity or visible swelling or effusion.  Based on the location of plaintiff's pain, Dr. Czaplewski suspected pes anserine bursitis.  (TR 451).

On November 30, 2005, Dr. Czaplewski completed a medical questionnaire for the plaintiff.  In response to the questionnaire, the doctor stated "Lagemann has been totally disabled from employment since November 17, 2004 and continues to remain totally disabled," and "is perhaps 75% permanently impaired."  (TR 494).

In December 2005 or January of 2006, the knee pain began again.  She returned to see Dr. Czaplewski in March of 2006.  (TR 551).  A knee x-ray performed in March of 2006 revealed mild to moderate degenerative changes; "not severe but more than one would ordinally expect to see in a 39 year-old."  (TR 551).  The plaintiff's right calf was tender and somewhat swollen.  (TR 551).  The plaintiff continued to complain of pain in her knee, radiating down her right lower extremity, at the time of her hearing.  The plaintiff testified that she had osteoarthritis in her knee with associated pain.  She complained of difficulty going up and down stairs, and numbness descending to her foot.  The plaintiff lives in a two-story house, with her bedroom on the second floor.  (TR 602-03).

The plaintiff saw Dr. Rakes less frequently in 2006 and 2007, (TR 558), and when she saw Dr. Rakes on June 28, 2007, was reportedly "quite happy," and "doing great."  She

-13-

asked for trigger point injections, but admitted she was not doing her yoga stretches, or physical therapy.  Doctor Rakes refused to administer trigger point injections, explaining:

> Recommendation would be for her to get physical therapy and do her exercises.  I tried to explain [to] her [that] she needs to start icing and put time in to take care of the spasm.  She, I think, agreed to try.  When she does this, then we will proceed with trigger points if they are needed.

TR 557.  The plaintiff did not return to see Dr. Rakes for about a year. (TR 556).  She also failed to return to physical therapy.  As of March 27, 2008, the plaintiff had not participated in physical therapy for a year.  (TR 562).

When the plaintiff saw Dr. Rakes in June of 2008, she reported her pain was the same. She complained of daily headaches and stated she was homebound due to pain. The plaintiff requested and received trigger point injections for pain relief because she was going on vacation.  (TR 556).

At the hearing before the ALJ on July 22, 2008, the plaintiff testified that her right shoulder and arm falls asleep or gets numb; she has muscle spasms in her neck when she bends her right arm, or uses it to reach overhead or forward; she has trouble looking down for prolonged periods; and when her neck starts bothering her, she has headaches.  (TR 610-12, 624-25).   She explained her difficulty in using a computer mouse or keyboard, and stated she cannot look at a computer screen for more than five minutes without experiencing spasms in her neck.  (TR 616-17).

Based on the physical RFC performed on December 28, 2005 by Harold W. Keairnes, M.D., the plaintiff's physical limitations are as follows:

--      The plaintiff can:

        •       occasionally lift and/or carry 20 pounds;

-14-

- • frequently lift and/or carry 10 pounds;
- • stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday;
- • sit (with normal breaks) for a total of about 6 hours in an 8-hour workday;
- • climb ramps and stairs;
- • balance, stoop, kneel, and crouch; and
- • push and/or pull (including operating hand and/or foot controls.

-- Due to chronic pain in right upper extremity, the plaintiff's reaching, handling, and fingering are limited to occasionally; she has a limited ability to lift and carry; and she cannot climb ladders and crawl.

-- The plaintiff has no visual, communication, or environmental limitations.

TR 192-198.

Dr. Keairnes explained that "[t]he pattern of Ms. Lagemann's reports suggest significant comorbidity from mental health problems." (TR 196). The doctor noted there were no neurological or orthopedic findings to explain the plaintiff's inability to use her right arm, and there was no supportive medical evidence for a functional limitation of the right hand and arm in addition to her general limitations from pain. (TR 198).

The mental RFC performed on January 6, 2006 by Patricia Newman, PhD, states the plaintiff has a disturbance of mood, accompanied by a full or partial manic or depressive syndrome, with "[a]nhedonia or pervasive loss of interest in almost all activities," "sleep disturbance," decreased energy," "feelings of guilt or worthlessness," and "difficulty concentrating or thinking." (TR 202). The RFC explains the plaintiff has:

-- a moderately restricted ability to:

- • perform activities of daily living;
- • maintain social functioning, concentration, persistence, and pace;
- • maintain attention and concentration for extended periods;

-15-

- • perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and
- • work in coordination with or proximity to others without being distracted by them.

-- no limitations in ability to remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out very short and simple instructions; carry out detailed instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; and interact appropriately with the general public.

TR 209, 213-14.  Dr. Newman summarized:

> This claim is partially credible. . . .  It does seem that claimant lacks energy, motivation and concentration to respond and adapt effectively to her current situation.  However, depression does not present to the level that it would preclude her from performing simple unskilled work. . . .  [C]laimant was able to complete a detailed ADL report, does some shopping and chores, and drives her children to school.  Given this sample, it appears that she would be able to do simple unskilled work.

(TR 218).

The hearing before the ALJ was held on July 22, 2008.  After reviewing the evidence of record and listening to the testimony of the plaintiff and her husband, the ALJ asked the VE to assume the plaintiff:

-- cannot:
  - • carry more than five pounds with the grip of her right fist;
  - • carry more than ten pounds using the crook of her arm, both arms, or by bracing her arm against her torso;
  - • extend her right upper extremity above her shoulder;
  - • work with right arm in a fully extended position in any direction;
  - • push or pull levers bilaterally with her upper extremities;
  - • work in a position in which her head would be turned in one direction with her arm extended in the opposite direction;
  - • work with her head flexed more than a 90-degrees compared to her forearm for more than five minutes;

-16-

- • push or pull levers repetitively with her lower extremity;
- • climb ropes or ladders;
- • power grip with her right dominant hand;
- • use air or vibrating tools;
- • use motor vehicles;
- • work at unprotected heights; and
- • work outside or in a factory where there was sustained fumes, dust, or smoke.

-- can use her arms to perform work at a 24-inch distance from her elbow, provided her right arm is rested on a table.

-- can rarely kneel.

-- can occasionally crawl or climb stairs.

-- can frequently stoop and squat.

-- has no limitations on her ability to understand, remember, or carry out short and simple instructions, perform 3-step tasks, or perform complex decision-making processes that can be learned in 30 days or less if reference books, manuals, or other materials are available.

-- has no limitations regarding being on her feet and walking.

TR 630-32.

Assuming these restrictions, the VE testified the plaintiff could not return to her past work.  However, if limited to light work, the plaintiff could perform the job of a cashier, DOT number 211 462 010, with approximately 2,000 positions in Nebraska and 200,000 positions nationally; or a general office clerk, DOT number 245 367 014, with 500 positions in Nebraska and 75,000 positions nationally.  If limited the plaintiff was limited to sedentary, unskilled work, the VE testified the plaintiff remains able to perform the job of a general office clerk job, DOT number 249 587 018, with approximately 300 positions in Nebraska and 50,000 positions nationally, or an account clerk, DOT number 219 587 010, with 500 positions in Nebraska and 60,000 positions nationally. (TR 634).

However, assuming the plaintiff's depression prevented her from going to work at least four times a month, or assuming she needs one to two hours of unscheduled additional breaks per day due to headaches, the VE opined the plaintiff would be unemployable.  (TR 635).

## VII.   ANALYSIS

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision.  A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.  Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed.  Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007).   Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome.  Wildman v. Astrue, 596 F. 3d 959 (8th Cir. 2010).

A.    Assessment of Lagemann's Impairments–Unsupported or Incomplete Hypothetical Question.

"It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [her] limitations."  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995).  Before the ALJ determines an applicant's RFC, the ALJ must determine the applicant's credibility, because subjective complaints play a role in assessing the RFC.  Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005).  See also, Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.").   An ALJ "is not required to discuss every piece of evidence submitted," and his "failure to cite specific evidence [in the decision] does not indicate that such evidence was not considered." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  An ALJ may exclude from the hypothetical question posed to the VE "any alleged impairments that she has properly rejected as untrue or unsubstantiated." Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001).

1.    Failure to Properly Assess Lagemann's Credibility.

The ALJ concluded Lagemann's statements concerning the intensity, duration and limiting effects of her symptoms were not entirely credible.   To assess a claimant's credibility, the ALJ must consider all the evidence, including:  (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.  Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009).   The ALJ is not required to discuss methodically each of these factors, so long as the ALJ acknowledges those considerations before discounting the subjective

complaints.  However, an ALJ who rejects  subjective complaints must make an express credibility determination which explains the reasons for discrediting the claimant's complaints.  Id.

The plaintiff asserts the ALJ's credibility determination is not supported by the record because he "simply refer[ed] to single records that exhibit limited improvement on one particular day which is not representative of Ms. Lagemann's condition as a whole."  Filing No. 17, p. 40.  The court disagrees.

The ALJ's decision discussed the lack of objective medical evidence underlying plaintiff's subjective complaints of pain.  The ALJ noted: 1) regarding plaintiff's neck, an MRI revealed "very subtle" degenerative changes at the C4-C5 and C5-C6 levels with no significant encroachment or motor involvement, (TR 23); 2) regarding plaintiff's right wrist, the preoperative examination in June 2004 revealed only "mild" carpal tunnel syndrome and some "mild" diminished grip strength, (TR 23);  3) following her carpal tunnel surgery, the plaintiff had a full range of motion in her wrist with only a mild Tinel's sign, and although she complained of decreased sensation at the tips of three fingers, she had no atrophy, (TR 24); 4) regarding plaintiff's shoulder, there was some decreased strength, but the range of motion studies were good and there was no MRI evidence of a labrum tear, (TR 24); and 5) regarding plaintiff's knee, MRI evidence indicated only minimal degenerative changes in the medial compartment, and x-rays revealed only mild to moderate degenerative changes, (TR 24).  The ALJ's description of the objective medical findings is fully supported by the record as a whole.

The ALJ's opinion also noted inconsistencies between plaintiff's actions and her subjective complaints.  Specifically, he cited Dr. Rakes' June 2007 progress notes which state Lagemann had not done her physical therapy, was not doing her yoga stretches, and had

not really invested personal time and effort in alleviating her myofascial pain.  The ALJ specifically referenced that after the June 2007 appointment, the plaintiff did not return to the pain clinic for nearly a year. (TR 24).  The ALJ noted that although the plaintiff testified that she has trouble getting up stairs, she uses a bedroom on the second floor of her house. The ALJ's opinion notes the plaintiff did not regularly see her psychiatrist, going as long as four months between office visits, (TR 26), and her appointments were "bi-monthly prescription checks," (TR 26), a fact fully supported by Dr. Harris' own recorded description of many appointments.  (See TR 521, 531-538).  Despite the severity of the plaintiff's complaints, as noted by the ALJ, the plaintiff was never hospitalized for treatment and denied any suicidal ideation.

Finally, the ALJ specifically referenced the discrepancies and undulation in plaintiff's complaints of fatigue and pain.  The ALJ's opinion notes several times when the plaintiff told her doctors she was doing well with certain treatment modalities, and although the plaintiff complains of chronic, unrelenting fatigue, the medical records and plaintiff's own testimony indicated using the CPAP was helping.

The ALJ concluded plaintiff's "lack of regular treatment, the failure to follow prescribed treatment, and medical findings of minimal changes support a conclusion that the claimant is not as limited as she alleges," (TR 23), and plaintiff's subjective complaints "concerning the intensity, duration, and limiting effects of her symptoms are not entirely credible." (TR 26).  The ALJ's opinion explains the factual basis for the credibility determination, and the facts cited are fully supported by the record as a whole.   This case cannot properly be remanded based on an alleged failure of the ALJ to properly assess and explain his credibility determination.

2.      Failure to Afford Proper Weight to the Treating Physicians' Opinions.

The plaintiff argues the ALJ improperly substituted his own opinion for that of the plaintiff's medical providers.  Specifically, she argues the ALJ's impairment determination conflicts with the opinion of:

1)      Dr. Baxter, who opined that Ms. Lagemann "should avoid use of the arm since she has chronic pain," and "has been totally disabled from employment since November 20, 2004, (TR 509-10).

2)      Dr. Czaplewski, who opined that Ms. Lagemann was "very substantially limited" in the activities of bending, lifting, sitting, standing, twisting [and] reaching," (Tr. at 494);

3)      Dr. Hammer, who opined that plaintiff's "current depressive symptoms would affect her ability to function in the workplace" and "she has difficulty coping with additional stressors," (TR 512); and

4)      Her mental and physical RFC evaluations.

Filing No. 17, pp. 20-22.

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009). Moreover, even if the ALJ concludes the treating source's medical opinion is not entitled to controlling weight, it may still be entitled to deference and be adopted by the adjudicator. SSR 96-2p, 1996 WL 374188 at *1 (S,S,A, 1996).  However, a treating physician's opinion "does not 'automatically control' in the face of other credible evidence on the record that detracts from that opinion. . . .   An ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough

-22-

medical evidence." Heino v. Astrue, 578 F.3d 873, 880 (8th Cir. 2009) (internal citations omitted); Medhaug, 578 F.3d at 815.

As described in the ALJ's opinion, although the plaintiff's treating doctors, Dr. Baxter and Dr. Czaplewski, provided opinions stating the plaintiff was unable to work, their own medical records, the medical records as a whole, and the plaintiff's actions do not support those opinions. From the standpoint of her right arm, Dr. Baxter anticipated the plaintiff's ability to return to work as early as mid-October 2004, (TR 417), and on November 5, 2004, released her to return to work on Monday, November 8, 2004, (TR 415). The plaintiff herself believed she could return to work. (TR 415). However, she had not returned to work as of November 11, 2004. (TR 427). Moreover, to the extent Dr. Baxter later concludes the plaintiff is disabled, the issue of employment disability is determined by the SSA, not Dr, Baxter; and Dr. Baxter's disability opinion is based on plaintiff's complaints of continuing pain, which the ALJ concluded were not entirely credible. Likewise, on November 30, 2005, Dr. Czaplewski completed a form stating the plaintiff is totally disabled, a determination ultimately vested in the SSA. However, as with Dr. Baxter, the disability determination was based in part on plaintiff's complaints of pain. (TR 495).

From a mental health perspective, the plaintiff's care providers never stated the plaintiff could not work. To the contrary, when Dr. Hammer saw the plaintiff on March 27, 2008 for "supportive psychotherapy medication management," she noted the plaintiff "will start teaching in May 2008." (TR 562). There is nothing to indicate Dr. Harris was concerned with plaintiff's plan to teach college level courses, and the plaintiff believed she was capable of doing so. (TR 605-06).

The plaintiff claims the ALJ disregarded the opinions of her treating providers and the RFCs. The ALJ did not ignore these opinions. Rather, after assessing the credibility of

plaintiff's subjective complaints and the objective medical findings, the ALJ concluded the plaintiff was impaired but not to the extent set forth in the opinions of her treating providers and the RFC examiners.  As explained by the ALJ:

> [T]he residual functional capacity in this case is not identical to that reached by the state agency physicians because they did not have the benefit of all of the evidence available to the undersigned.  Based on their review of the record available to them at that time, the undersigned is persuaded that it is generally consistent with the review in this Decision, but the found residual functional capacity is based on the totality of the record available to the undersigned.
>
> The undersigned considered all of the opinions of record in light of the objective medical evidence and finds that the evidence of record supports the conclusion that the claimant has some limitations in the ability to perform a full range of work, but not to the extent that the claimant is completely unable to perform all sustained work whatsoever.

(TR 25).

The RFC determination reached by the ALJ was based on his determination of plaintiff's credibility; the plaintiff's own testimony regarding the physical positions, limitations, and situations that caused her discomfort; the medical records as a whole; and to the extent they were not inconsistent with the foregoing findings, the opinions of plaintiff's medical providers and RFC examiners.  After determining the extent of plaintiff's impairments, the ALJ formulated and posed a hypothetical question to the VE consistent with his RFC findings.  The ALJ's determination will not be reversed or remanded for posing improper or incomplete hypothetical questions to the VE.  See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir.2001) (ALJ may exclude alleged impairments he has properly rejected as untrue or unsubstantiated).

-24-

B.    Relying on VE Testimony that Conflicts with DOT Job Definitions.

The plaintiff argues the VE's testimony regarding the available job market was inconsistent with the Dictionary of Occupational Titles (DOT), and the characteristics of the jobs chosen were in conflict with the limitations in the hypothetical.

SSR 00-4p states:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.  Neither the DOT nor the VE . . . evidence automatically "trumps" when there is a conflict.  The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

SSR 00-4p ("Resolving Conflicts in Occupational Information").   See also, Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 979 (8th Cir. 2003)("[A]n ALJ cannot rely on expert testimony that conflicts with the job classifications in the DOT unless there is evidence in the record to rebut those classifications. . . .").

The ALJ's decision must explain how any conflict between the VE's testimony and the DOT job description was resolved.  SSR 00-4p ("Explaining the Resolution").   In resolving the conflict, the ALJ may consider whether the VE possesses information not listed in the DOT about a specific job.  "DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range."

-25-

Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000)(citing Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997).  These descriptions "may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities."  Id.  The  DOT's definition of an "occupation" is a collective description of numerous jobs, and information "about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's . . . experience in job placement or career counseling."  SSR 00- 4p.  "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT."  Wheeler, 224 F.3d at 897.

        The VE testified that the plaintiff could perform two jobs characterized as "light work: a cashier or a general office clerk.  At the ALJ's request, the VE limited his testimony to sedentary, unskilled work.  The VE testified the plaintiff remains able to perform the job of a general office clerk job (Document Preparer, Microfilming), DOT 249 587 018, 1991 WL 672349; or an account clerk (Parimutuel-Ticket Checker), DOT 219 587 010, 1991 WL 671989.  The physical requirements of these jobs are described as follows:

> STRENGTH: Sedentary Work - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the period, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

The DOT description of physical abilities required to perform the job of a general office clerk job, (DOT 249 587 018), or an account clerk, (DOT 219 587 010), is wholly consistent with the ALJ's RFC findings and hypothetical question.

The plaintiff claims the VE's testimony was inconsistent with ALJ's hypothetical question because the sedentary, unskilled jobs identified by the VE require at least frequent reaching, handling, and fingering.   However, the ALJ did not limit the frequency of plaintiff's ability to perform reaching, handling, and fingering, and did not mention handling and fingering at all.   Accordingly, the VE was not required to consider frequency of movement in determining the job market remaining available to the plaintiff despite plaintiff's impairments.   The VE's testimony was "consistent with and not in conflict with the DOT."  (TR 638).

There is adequate evidence of record to support the ALJ's conclusion that Lagemann is able to perform jobs existing in significant numbers in the national and Nebraska economy.

I find that substantial evidence supporting the ALJ's decision exists in the record as a whole.   Accordingly,

IT IS ORDERED that the findings and conclusions of the ALJ are affirmed.

DATED this 16th day of June, 2011.

BY THE COURT:
*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.